IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | |
|---|---|
| REBECA GONZALEZ , | ) |
| | ) |
|     **Plaintiff,** | ) |
| **v.** | ) |
| | ) **NO.** _____ |
| **WILLIAM BARR,** | ) |
| **ATTORNEY GENERAL,** | ) |
| **DEPARTMENT OF JUSTICE,** | ) |
| **DRUG ENFORCEMENT ADMINISTRATION (DEA)** | ) |
|     **Defendant.** | ) |

## *COMPLAINT*

### *Introduction*

1.    This is a complaint for damages, declaratory and injunctive relief authorized and instituted pursuant to Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. 2000e et seq. ("Title VII").

2.    This lawsuit is brought to prevent Defendant, WILLIAM BARR, ATTORNEY GENERAL, DEPARTMENT OF JUSTICE, DRUG ENFORCEMENT ADMINISTRATION (DEA), pursuant to Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. 2000e, et seq. ("Title VII"), from maintaining a policy, practice, custom or usage of discriminating against, Plaintiff, REBECA GONZALEZ , in regard to terms, conditions and privileges of employment, and for damages, and other equitable relief for Plaintiff, REBECA GONZALEZ , who has been discriminated against by Defendant on the basis of national origin (Hispanic), and sex (female).

### *Jury Demand*

3.    A jury is hereby demanded.

### *Jurisdiction and Venue*

4.      This action is brought for a declaratory judgment, injunctive relief and compensatory damages, pursuant to 42 U.S.C. Section 1983, 20 U.S.C. Sections 1681-1688, 28 U.S.C. Sections 2201 and 2202.  This Court has jurisdiction to hear the Plaintiff's claims pursuant to 28 U.S.C. Sections 1331, 1343(3) and (4) 1337 and 42 U.S.C. 2000e-5(f) [Section 706(f)(s) and (3) and 704(a) of Title VII].

5.      Venue is proper in the Western District of Texas, El Paso Division pursuant to 28 U.S.C. Section 1391(b) as El Paso County, Texas is the county where the Defendant operates the WILLIAM BARR, DEPARTMENT OF HOMELAND SECURITY, CUSTOMS AND BORDER PROTECTION (CBP), Plaintiff's employer.  Further, all actions complained of herein occurred within the El Paso County, Texas.

### *Parties*

6.      Plaintiff, REBECA GONZALEZ  is a Hispanic female citizen of the United States and a resident of the City of El Paso, El Paso County, Texas.

7.      Plaintiff is employed by the Defendant, WILLIAM BARR, ATTORNEY GENERAL, DEPARTMENT OF JUSTICE, DRUG ENFORCEMENT ADMINISTRATION  (DEA).  The Defendant maintains and administers records relevant to its employment practices.  Service of process may be made upon the United States Attorney for the Western District of Texas, and the United States Attorney General, DEPARTMENT OF JUSTICE, DRUG ENFORCEMENT ADMINISTRATION  (DEA), by registered or certified mail, pursuant to the Federal Rules of Civil Procedure (Rules 4(I)(1)(A), (B) & (C)).

8.      Defendant is an employer within the meaning of 42 U.S.C. 2000e, et seq., ("Title VII").

### *Exhaustion of Remedies*

9.      Plaintiff filed a formal complaint of discrimination.   Such filing was within at least 45 days of the last act of which he complained.   Plaintiff's formal complaint alleged denial of Plaintiff's rights, by Defendant, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, et seq., as amended by the Civil Rights Act of 1991.   Specifically, REBECA GONZALEZ alleges that she was discriminated against because of her national origin (Hispanic), and sex (female).

10.     All conditions precedent to the filing of the lawsuit has been met.

### *Factual Allegations*

11.     Plaintiff is a Hispanic female.

12.     Plaintiff works with the U.S. DEPARTMENT OF JUSTICE, DRUG ENFORCEMENT ADMINISTRATION (DEA).

13.     Plaintiff was discriminated against by the Agency based on her national origin (Hispanic) and sex (female/sexual harassment), when on or about September 23, 2013, she was assaulted by AO Angle Olivares on the upper portion of her back with his elbow and arm.

14.     Mr. Olivares set a negative and discriminatory tone in the relationship with the Plaintiff from the first time he entered on duty as Administrative Officer at the El Paso Intelligence Center (EPIC).   Mr. Olivares employed military techniques to interact with the Plaintiff, not commonly used in the Federal workforce, and subjected the Plaintiff to a severe and a pervasive hostile work environment.

15.     The Plaintiff suffered physical harm by Mr. Olivares' actions.   The Texas Penal Code 22.01(3), states, "intentionally or knowingly causes physical contact with another when the person knows or should reasonably believe that the other will regard the contact as offensive or provocative."   Plaintiff's was assaulted by AO Mr. Olivares on the upper portion of her back with

his elbow and arm.

16.     Mr. Olivares was investigated by the Agency's Office of Professional Responsibility

(OPR)." Executive Assistant, Scott Mr. Linn conducted a meeting with the Plaintiff and Mr. Holley

on November 22, 2013. An email from Mr. Linn stated "to discuss the matter of the assault noted on

the Plaintiff's grievance." This meeting was an effort to subdue the severity of the matter of the

assault and was an attempt to dissuade and intimidate the Plaintiff from making the allegation of

assault against Mr. Olivares.

17.     During this meeting, Mr. Linn and Mr. Holley (white males) asked the Plaintiff if she

understood the definition of assault because it was a serious accusation that would require it be

reported to OPR. Mr. Linn asked the Plaintiff to read Texas Penal Code 22.01 Assault aloud to Mr.

Linn and Mr. Holley. The Plaintiff stated that section three applied to her.

The Texas Penal Code 22.01(3), states:

> "intentionally or knowingly causes physical contact with another when the person
> knows or should reasonably believe that the other will regard the contact as
> offensive or provocative."

18.     The Plaintiff was required to answer to a line of questioning from Mr. Linn without

having a witness present. Some of the questions Mr. Linn asked the Plaintiff included, if she had

called 911; if the Plaintiff had filed a police report; if she went to the emergency room; if the

Plaintiff had fallen; if the Plaintiff had sustained a bruise, etc. The Plaintiff responded that she did

not know she could have filed a police report. When the Plaintiff made her initial complaint to Mr.

Holley, Mr. Holley did not provide the Plaintiff with any information about reporting the assault to

the police or to OPR. Note that the building where the assault occurred on a military base, on U.S.

government grounds.

19.     During this meeting of November 22, 2013, the Plaintiff asserts that she was constantly interrupted by inappropriate comments from Mr. Holley, who was clearly defending Olivares. The Plaintiff explained to Mr. Linn and Mr. Holley that Olivares had elbowed the Plaintiff on the upper portion of her back so much that the Plaintiff jerked to the front. This incident was not an accident, and was intentional. The Plaintiff was being dissuaded from using the word "assault." After an arduous line of questioning, Mr. Linn advised the Plaintiff that he would report the issue to OPR.

20.     According to the Department of Justice, Standards of Conduct 1-4.11 states:

"The supervisor shall evaluate whether the misconduct at issue is serious, and if so shall report the evidence or non-frivolous allegation to the Office of the Inspector General (OIG) or to the Office of Professional Responsibility (OPR)."

21.     However, Mr. Holley did not report the issue directly to his superior or higher ranking official immediately after the Plaintiff reported Olivares had "elbowed" her and disclosed a "laundry" list about Olivares' misconduct. The Plaintiff, in addition to reporting Olivares "elbowing" her, explained to Mr. Holley how Olivares was subjecting her to a hostile work environment on September 30, 2013.

22.     Furthermore, the Department of Justice, Standards of Conduct 1-4.11, state,

"When an employee or a supervisor is uncertain as to whether a certain allegation should be referred, the supervisor may telephone OPR or OIG to determine what action to take."

23.     Mr. Holley did not follow up with the Plaintiff about the status of her allegations and the Plaintiff did not hear from Mr. Holley for nearly two months (after the Plaintiff's initial reporting to Mr. Holley on September 30, 2013), when the Plaintiff filed a grievance regarding her interim performance evaluation on November 8, 2013, and submitted Vasquez' witness statement.

24.     The Plaintiff was advised in writing that she would be reporting directly to Mr. Holley. Mr. Holley removed the Plaintiff's Assistant Administrative Officer, GS-12, duties in order to perform lower graded duties as a Purchasing Agent, GS-8, affecting the Plaintiff's condition of employment since December 2013. The Plaintiff has not performed the position she was hired to perform and was forced to learn a lesser grade new job, changing the conditions of the Plaintiff's employment. Furthermore, when the Plaintiff reports issues regarding work, management takes her statements as complaints and uses them as justifications to reprimand her and retaliate against her.

25.     The Plaintiff was only "Acting" Administrative Officer for one week and a delegation of authority was sent to the entire staff notifying them that the Plaintiff would be "Acting." The Plaintiff did not experience any issues with any subordinate during the eight months she served as "Acting" Administrative Officer. The Plaintiff did not receive a performance award or any compensation for fulfilling "Acting" duties, where the Plaintiff worked two grades above her GS-12 position for eight months with no compensation.

26.     The building where the assault occurred on a military base, on U.S. government grounds. In light of the recent House Oversight and Government Reform Committee's Final Report titled, The Handling of Sexual Harassment and Misconduct Allegation by the Department's Law Enforcement Components, Evaluation and Inspections Division 15-04, dated March 2015, the Office of Inspector General (OIG) made a recommendation to DEA that, "supervisors and managers report all allegations of sexual misconduct and sexual harassment to headquarters, and they should consider ensuring compliance with this requirement by including it in their performance standards so as to subject supervisors and managers to possible discipline for failing to report allegations."

27.     On October 22, 2014, the DEA Administrator issued a memorandum entitled "Conduct of DEA Employees" to satisfy the OIG's recommendation. The memorandum from the

Administrator was issued a year after to the Plaintiff's assault and other allegations.

28.     It should be known that the Plaintiff has not performed the position she was hired to perform and was forced to learn a lesser grade new job, changing the conditions of the Plaintiff's employment. Furthermore, when the Plaintiff reports issues regarding work, management takes her statements as complaints and uses them as justifications to reprimand her and retaliate against her.

29.     Immediately upon becoming the Plaintiff's supervisor on May 22, 2013, Mr. Olivares asked the Plaintiff for a "favor" to take an Internet personality test, which the Plaintiff found to be an odd request from a supervisor.

30.     The Plaintiff was concerned that Mr. Olivares would base his opinion of her on an Internet test rather than daily interaction with the Plaintiff.  The Jung Typology test, that Mr. Olivares requested the Plaintiff to take, was not supported by any DEA or medical science or institution.  The Plaintiff knew from her 18 years as a Federal employee that it was not required or sanctioned by any federal agency, specifically DEA. The Plaintiff expressed her concerns to former Administrative Assistant Special Agent (ASAC) Ruth Porter-Whipple.  Ms. Porter-Whipple supported the Plaintiff's stance and mentioned to the Plaintiff that perhaps Mr. Olivares should have spoken to her (Porter-Whipple) and the employees prior to sending the email to request the personality test. After Mr. Porter-Whipple checked with DEA Headquarters (HQ) and with legal counsel, she informed Mr. Olivares that psychological tests are not required by DEA. Mr. Olivares became infuriated that the Plaintiff expressed her concerns to the chain of command, a practice commonly used in the federal service. Mr. Olivares was made to issue an apology to the Plaintiff for his lack of judgment.  In a scornful and antagonistic manner, Mr. Olivares demanded that the Plaintiff go to him before arbitrarily going to someone else. Mr. Olivares said to the Plaintiff that she "showed him no respect."

31.     Mr. Olivares further subjected the Plaintiff to close door meetings where he demoralized and humiliated her.  In one of those meetings on July 1, 2013, Mr. Olivares, out of the blue, demanded to know the qualifications of Program Analyst Deborah Gregory, who had applied for the Administrative Officer position at the same time he did.  Mr. Olivares ranted to the Plaintiff, "I have no trust in you.  I expected my assistant to tell me that Gregory had applied for the position." Mr. Olivares bluntly asked the Plaintiff if she felt that Gregory was more qualified than he was, and she answered that she felt that anyone with prior Federal service would have been more qualified.

32.     In an attempt to intimidate the Plaintiff, Mr. Olivares told the Plaintiff that he was "personal friends outside of work" with ASAC Morgan Mr. Holley (retired-white male), former ASAC Ruth Porter-Whipple, and other management officials and would attend barbeques with the aforementioned prior to his selection as Administrative Officer at EPIC.  Mr. Olivares further added, "It wasn't my fault I was given the position."   Mr. Olivares was selected by Mr. Jennings, with the recommendations from Porter-Whipple and Mr. Holley.  The preferential treatment that Mr. Olivares received on his selection to Administrative Officer fueled Mr. Olivares' sense of entitlement and was a precursor to him abusing his authority against the Plaintiff.  Mr. Olivares insisted that he could not "trust" the Plaintiff and said he needed the Plaintiff to do more outside the duties listed on her position description because Mr. Olivares needed to "trust" the Plaintiff.

33.     While the Plaintiff served in the capacity of Acting Administrative Officer on August 28, 2013, former Administrative Assistant Special Agent in Charge Mr. Holley asked the Plaintiff if there were any issues to report.  The Plaintiff mentioned her concerns about Mr. Olivares and Accountant Isabel Fitzgerald in what appeared to be that leave and security policies and procedures were not being followed.  The Plaintiff's main concern was that both Mr. Olivares and Fitzgerald were fairly new Federal employees and perhaps needed guidance.  Furthermore, the Plaintiff found it

unusual for Mr. Olivares to call the office numerous times while he was on TDY for what appeared to be a simple leave issue regarding Fitzgerald. The Plaintiff realized that Mr. Olivares was not receptive to the policy information she was providing him both orally and in writing. The Plaintiff's efforts to provide guidance to Mr. Olivares were turned down in an antagonistic and intimidating manner so much that Mr. Olivares ordered the Plaintiff to "stand down." The Plaintiff maintains that she followed due diligence in the performance of her duties as indicated on her Position Description, specifically where it states that the incumbent of the Assistant Administrative Officer "acts as a principal advisor to the EPIC Administrative Officer" and "exercises full responsibility as Administrative Officer in his/her absence." However, Mr. Olivares was not receptive to the guidance, advice, or recommendations coming from the Plaintiff. Mr. Olivares repudiated any input from the Plaintiff.

34.     On July 9, 2013, Mr. Olivares sought the Plaintiff to serve as a witness when he conducted a meeting to berate and humiliate another female employee, Supply Technician Lisa Ms. Lee, and bringing Ms. Lee to tears. After the meeting, Mr. Olivares asked the Plaintiff if he could deny Ms. Lee's request for military training and how to remove Ms. Lee duties from Ms. Lee. Mr. Olivares would later employ the same tactics against the Plaintiff.

35.     In a different meeting on September 27, 2013, Mr. Olivares ridiculed the Plaintiff in front Acting Section Chief Rafael Garcia (male and close personal friend of Olivares) by making serious and slanderous accusations towards the Plaintiff, and ridiculing her skills and down playing her abilities in front of another manager in a heated discussion. Mr. Olivares blamed the Plaintiff for not being proactive, for lacking initiative and for not performing work. This was an attempt by Mr. Olivares to chastise, intimidate and coerce the Plaintiff, in the same manner he had done with Ms. Lee, to ultimately bring the Plaintiff to tears. The Plaintiff has shown that genuine issues exist and

she has met the material elements of her hostile environment claim.

36.     In a separate meeting on September 25, 2013, Mr. Olivares met with the Plaintiff, Fitzgerald, and Fiscal Supervisor Rebecca Sanchez to announce that the Plaintiff would no longer serve in the capacity of "Acting Administrative Officer;" thus removing significant duties from the Plaintiff and creating a wedge between the Plaintiff, Fitzgerald, Sanchez, and other employees located in the Fiscal Office:   Accounting Technician Mary Anne  Southwick, Fiscal Specialist Milagros Ortiz-Diaz, Purchasing Agent Olga Padilla; and, Contractors Karla Chavez-Barraza and Delma Acosta.

37.     Essentially Mr. Olivares has divided the office and the aforementioned individuals do not speak to the Plaintiff and, Mr. Olivares favors Fiscal employees.  Mr. Olivares humiliated the Plaintiff in front of her co-workers and he left them with the sense that the Plaintiff was not competent to perform "Acting" duties even though the Plaintiff had previously served in the "Acting Administrative Officer" capacity for eight months.  The Plaintiff did not receive a performance award or any compensation for fulfilling "Acting" duties, where the Plaintiff worked two grades above her GS-12 position for eight months with no compensation.

38.     Mr. Olivares' intimidating behavior was evident between May to November 2013, when he tasked the Plaintiff to get him a donut from the front office.  When the Plaintiff complied by standing up, Mr. Olivares smirked and said, "I didn't really want a donut."  Mr. Olivares was mocking her and insulting her intelligence.

39.     In another instance, Mr. Olivares accused the Plaintiff and Administrative Support Specialist Valerie Letman about not thinking "outside the box" and not being professionals when he did not understand a work requirement.  The Plaintiff felt that it was not the best approach to motivate employees and articulated how difficult and frustrating it was to work for Mr. Olivares and

how, it seemed, he lacked the knowledge to perform his job. Further, Mr. Olivares used foul language around the office when describing food and lunches as "cacaguada" referring to a combination of thin, washy, watery fecal matter in Spanish.

40.    Mr. Olivares also issued an innuendo to the Plaintiff by stating, "I'd like to be in your calendar" embarrassing the Plaintiff in front of her peers. Further, Mr. Olivares insisted that the Plaintiff report to his office each morning to say "hi" and to see if he needed anything in the mornings.

41.    The Plaintiff reported Mr. Olivares' transgressions to Mr. Holley on September 30, 2013, Mr. Holley was outraged. The Plaintiff reported that Mr. Olivares had "elbowed" her and that she thought it was not an accident and that she felt it was something more. Mr. Holley asked the Plaintiff, "Is this an exaggeration?" The Plaintiff responded, "Don't you think that I'm embarrassed to sit here in front of you and tell you all of this." The Plaintiff further explained that Mr. Olivares made statements to her about having no initiative and not getting along with other employees and that at one point, Mr. Olivares accused the Plaintiff of creating a hostile work environment for him. The Plaintiff notified Mr. Holley that Mr. Olivares did not assign her any work and she was worried about her upcoming evaluation. Mr. Holley did not report any of the Plaintiff's allegations any further, but instead said he would talk to Mr. Olivares about the issues. Mr. Olivares targeted the Plaintiff for reporting his conduct to Mr. Holley.

42.    On November 6, 2013, Mr. Olivares removed the Plaintiff's gliding schedule; and, to justify his actions, he also removed Sanchez and Accounting Technician Elena Besaw from their gliding schedules as well. Later, Besaw's flexible schedule was restored at her request due to her obvious disability. Mr. Olivares further threatened the Plaintiff by saying he would change her place of employment by sending her to the warehouse to work. Mr. Olivares refused to assign the Plaintiff

any work and failed to include the Plaintiff in emails and meetings.

43.     Mr. Olivares never counseled the Plaintiff about her performance or formally advised the Plaintiff how her performance would be measured. He never conducted a performance progress review. At the same time, the Plaintiff did not receive any feedback or coaching from Mr. Olivares. Further, Mr. Olivares kept the Plaintiff idle for months displaying gross negligence towards the Plaintiff and affecting a condition of her employment.

44.     On June 2013, Mr. Olivares denied a training request from the Plaintiff for a Contracting Officer course. On August 2013, Mr. Olivares denied a training request for Supervisory Training when the Plaintiff received an invitation from the DEA Academy/Quantico. On the Plaintiff's performance evaluation for FY2013 Mr. Olivares demonstrated his disdain towards the Plaintiff by rating her poorly and including personal statements and beliefs about the Plaintiff instead of rating the Plaintiff against performance standards. The FY2013-2014 Performance Management Requirements dated September 3, 2013, states, "a rating official should fairly and accurately evaluate the employee's performance measured against the established performance standards."

45.     The profound animosity Mr. Olivares felt towards the Plaintiff was finally demonstrated when he engaged in physical contact to deliberately and instinctively "elbowed" the Plaintiff on September 23, 2013.

46.     Further, the Plaintiff was in a disposition to resolve the issue within EPIC and requested a formal meeting with Director/SAC Timothy A. Jennings (white male) on her performance grievance dated November 8, 2013. The Plaintiff was aware that Mr. Jennings had changed Intelligence Research Specialist William Freundlich's (white male) performance evaluation from Excellent to Outstanding. The Plaintiff requested that some of the remarks be removed. The Plaintiff was referred to Executive Assistant Scott Mr. Linn (white male), who had recently reported

to EPIC and had limited knowledge of EPIC or its personnel. Additionally, Mr. Linn was a personal friend of Mr. Holley's and was attempting to swiftly resolve and lessen the issues by threatening and intimidating the Plaintiff. Mr. Linn is responsible for responding to OPR, OIG, and EEO inquiries on behalf of EPIC, which can only be construed as a conflict of interest.

### *Plaintiff's Background*

47.     The Agency promoted Plaintiff to the position of Assistant Administrative Officer at EPIC in January, 2012, after she had spent the previous two years at EPIC as an Administrative Support Specialist. Her duties included "(a]ct[ing] as principal advisor to the EPIC Administrative Officer" and "(s]erv[ing] as assistant to the Administrative Officer in all functional areas of administrative services." She served "under the general supervision of the Administrative Officer" and was also "[r]esponsible to the Administrative Officer for the management, direction and control of personnel, fiscal and general services for EPIC."

48.     Plaintiff became the acting Administrative Officer when the position was temporarily vacated, and she served in that capacity for roughly eight months until Mr. Olivares began as the permanent Administrative Officer on May 20, 2013. The Plaintiff is an asset to the organization and aspires to one day become an Administrative Officer as a GS-14 for DEA, not just EPIC, or any other Federal agency.

49.     At the time the Administrative Officer position was announced, the Plaintiff understood her ineligibility for consideration since the Plaintiff has not served the next lower grade level, GS-13. As a GS-12, the Plaintiff was not allowed to apply for a GS-14, which the Administrative Officer position at EPIC was advertised at.

50.     It was the Plaintiff's personal opinion that "anybody" within the Agency, or who had experience as a federal civilian employee should have been selected. The Plaintiff explained to Mr.

Olivares that she was not the selecting official, that she did not make those types of decisions at her level, and that it was none of her concern how or why employees are selected. Further, the Plaintiff explained that she processed selections in the performance of her duties and strived to maintain the integrity of selections. The Plaintiff further told Mr. Olivares that it was not her place to discuss with him the details or the candidates surrounding the vacancy announcement for which Mr. Olivares was selected.

51.     The Plaintiff mentioned to Mr. Olivares that perhaps he was feeling insecure about her working relationship with Gregory, and the Plaintiff assured Mr. Olivares that there would be no conflict stemming from it and that he should learn to work with Gregory and others instead of casting individuals away. The Plaintiff explained that Gregory has extensive knowledge of EPIC programs, experience that Mr. Olivares could tap into. The Plaintiff reminded Mr. Olivares that Gregory had assisted him by providing him with the guidelines he needed and by providing guidance on how to obtain some new requirements.

52.     Mr. Olivares had a difficult time transitioning from his military career to a Federal career, and it is even more challenging to transition into a federal non-military supervisory role. In fact, Mr. Olivares did not serve in a supervisory capacity to civilians, prior to his selection to Administrative Officer, or when he worked as a contract Reports Writer in a non-supervisory contract position. In the following statement, Mr. Olivares expresses himself as if still working for the military, "As a military officer, he (Olivares) often asked his close staff to take similar tests so that he could understand how to engage with them, and his motive in asking the Plaintiff and Sanchez was no different." It should further be known that Mr. Holley allowed Mr. Olivares to postpone his (Olivares) mandatory HQ Non-Agent Group Supervisor training scheduled for September 11-18, 2013. Furthermore, the Plaintiff has never served in the military; therefore, she

does not have a military background.

53.     It should be expected that Mr. Olivares be fully competent to perform the duties of the Administrative Officer, GS-14.  At the time that Mr. Olivares applied for the Administrative Officer position, he certified on his application for Administrative Officer that he met the skills, knowledge and ability to perform the job.  It is reprehensible for Mr. Olivares to ask Plaintiff to take "tests so that he could understand how to engage with them."  It was Mr. Olivares' responsibility to check with his supervisor prior to asking his subordinates to take something as significant as an unapproved psychology test from some random Internet site.  The Plaintiff does not know how Mr. Olivares would have responded had Mr. Olivares simply elected to talk to his superior.

54.     As stated above, Plaintiff never tired to undermine Mr. Olivares.  He was successful on his own.

55.     On August 28, 2013, the Plaintiff was left in the "Acting" capacity for Mr. Olivares, while he was on TDY.  Mr. Olivares called the Plaintiff about Fitzgerald's leave several times and the Plaintiff noticed that Fitzgerald had not submitted a leave request for leave taken.  It was then that the Plaintiff discovered that it appeared that Mr. Olivares and Fitzgerald were keeping separate tallies of her leave balances outside of official DEA leave records.  The Plaintiff emailed both Mr. Olivares and Fitzgerald the "Time and Attendance Policy" and suggested that if Fitzgerald did not have any leave, leave could be advanced to her.

56.     The Plaintiff was aware that Fitzgerald had worked until eight o'clock in the evening and she asked Fitzgerald if she had signed in at the Watch Commander's desk since security policy indicates that anyone working pass six o'clock must sign in to ensure everyone is accounted for in the building.  Fitzgerald did not know that she had to sign in at the Watch Commander's desk.  Fitzgerald did not provide any information about her hours to the Plaintiff other than it had already

been approved by Mr. Olivares.   Additionally, Fitzgerald had not provided requests to work compensatory time or overtime, which had to be approved prior to the pay period in question.

57.     Furthermore, Mr. Olivares had no reason to call the Plaintiff because she automatically assumes the role of "Acting" Administrative Officer, other than to diminish the Plaintiff's ability to serve as the "Acting" Administrative Officer.  Mr. Holley asked the Plaintiff about the operations in the office and the Plaintiff expressed her concerns about how Mr. Olivares and Fitzgerald were handling Fitzgerald's leave since they were both new Federal employees.  Mr. Holley became concerned and told the Plaintiff he would speak to Mr. Olivares.

58.     At one point, Mr. Olivares called the Plaintiff into his office and was not aware that Mr. Olivares was about to admonish Ms. Lee for questioning a Program Coordinator about an unknown vehicle that was parked in the covered parking lot, where only government owned vehicles are supposed to park.

59.     However, there is policy in place that determines who and what type of vehicles are allowed to park in the covered parking, additional clearances from Mr. Olivares are not needed.  Mr. Olivares was extremely argumentative and yelled at Ms. Lee during the "performance" meeting.  Mr. Olivares humiliated and degraded Ms. Lee to the point that Ms. Lee began to cry and placed Plaintiff in a very uncomfortable situation regarding Ms. Lee.   Furthermore, Mr. Olivares did not communicate to Plaintiff about the meeting ahead of time, blind-siding the Plaintiff.

60.     Plaintiff later had a conversation with Ms. Lee and apologized for the situation because the Plaintiff questioned if the meeting was effective, and the Plaintiff was unsure if she had done the right thing by letting Mr. Olivares continue with the meeting.  The Plaintiff also told Ms. Lee that she did not realize how upset Mr. Olivares was until he closed the door and started screaming at Ms. Lee.

61.     After the "performance" meeting, Mr. Olivares asked the Plaintiff how he could take the Fleet duties from Ms. Lee, and if he could deny Ms. Lee's leave request for military training. The Plaintiff provided Mr. Olivares with Ms. Lee's position description where it listed Fleet duties as 50% of her duties, and the Plaintiff also researched whether or not Ms. Lee was entitled to volunteer for military training.   This line of questioning is surprising to be asked about Ms. Lee's military training since Mr. Olivares has a military background, and should be familiar with the rules governing military reservists.   The Plaintiff researched the information Mr. Olivares needed regarding Uniform Services Employment and Reemployment Rights (USERRA) and provided it to Mr. Olivares.

62.     The hostility against the Plaintiff is particularly reflected on the statements they made to the EEO Counselor from December 3, 2013 to December 17, 2013, when members of the Fiscal staff were interviewed.  For instance, (1) Supervisor Sanchez stated the Plaintiff: "called me on my personal phone, work phone, and emailed me for something that was not urgent."  Sanchez also stated the Plaintiff, "questioned her about an employee that she (the Plaintiff) had no responsibility for (Fitzgerald)."  (2) Mr. Olivares allowed Sanchez to postpone Non-Agent Group Supervisor Training scheduled for September 11-18, 2013. (3) Padilla made exaggerated statements about the Plaintiff stating that, "When, Ms. Gonzalez was acting it got so bad I wanted to quit because of how Ms. Gonzalez treated me when Mr. Olivares was TDY."

63.     It should be known that Mr. Olivares purposely called the Plaintiff to his office and demanded to know if the Plaintiff thought Gregory was more qualified than he.  The Plaintiff expressed her opinion by indicating that she thought Gregory was more qualified during a face to face meeting when Mr. Olivares called her in for a meeting on July1, 2013.

64.     Further, the Plaintiff clarified that Gregory is a work friend, a colleague, and has not engaged in any activities with Gregory outside of work.

65.     While Plaintiff did send out an email stating Mr. Olivares was a "pendejo" it was hardly an obscenity or a vulgarity in Spanish.  The word "pendejo" is easily translated to idiot or dummy.  Emails were frequently exchanged by employees, however, none where ever made as a jab towards Mr. Olivares by Plaintiff.  Plaintiff never composed any emails, nor did she reply or forward the emails to anyone else.  The Plaintiff made one single comment on an email out of countless of emails she received from Special Agent Eric Neubauer, because she found the email intriguing how doctors were able to save a man's hand by grafting it to his ankle.  Plaintiff simply replied, "Eric—You're hilarious…it's a possibility!"  The Plaintiff did not compose the original email message as she was one of the recipients of the message.  The Plaintiff does not have any control of the emails she receives or, for that matter, for the content of the emails.  It is unclear why Mr. Olivares took these emails as a personal attack.

### *The September 23, 2013 "Assault"*

66.     The Agency would like to believe that the assault incident of September 23, 2013, was fully investigation.  In reality, the OPR did not fully investigate the allegations from the Plaintiff of September 23, 2013, since Mr. Jennings requested to conduct an internal management review instead.

67.     On or around January 16, 2014, Director/SAC Jennings called the Plaintiff to his office and advised her that he was working on a request to separate the Plaintiff's allegations in two parts:  (1) OPR would *only* investigate the assault portion of her complaint; and, (2) Mr. Jennings would conduct an internal management inquiry on the "other" management issues the Plaintiff alleged.

68.     The OPR, via telephone, audiotaped the Plaintiff on April 22, 2014, while she sat in a room without any witnesses or an attorney.  When OPR conducted their on-site investigation on May 27-28, 2014, the Plaintiff was initially scheduled to be interviewed in person, but OPR cancelled the interview at the last minute and did not interview the Plaintiff/victim.  OPR Investigator Mark C. Styron sent an open email titled Schedule of Interviews on May 21, 2014, indicating that Letman, Sanchez, Ms. Lee, Alvarez, Gregory, Olivares, and Gonzalez were scheduled to be interviewed.  This email generated turmoil in the office and further disparaged the Plaintiff.

69.     The Final Report, The Handling of Sexual Harassment and Misconduct Allegation by the Department's Law Enforcement Components, Evaluation and Inspections Division 15-04, dated March 2015, indicates that,

> "On November 17, 2014, the DEA issued a memorandum and implemented new procedures to ensure systematic coordination between the Office of Professional Responsibility (OPR) and the Office of Security Programs (IS) when misconduct allegations are such that it warrants an assessment to determine whether an employee's security clearance should be maintained."

70.     This mechanism has not yet been employed.  According to the Final Report, DEA must provide "by June 30, 2015, a description of the new procedures in place to ensure the systematic coordination between the OPR and the IS regarding assessment of security clearances involving allegations of misconduct.  The Final Report also denotes that, "DEA had established clear and consistent criteria to determine whether an allegation should be investigated at headquarters or referred back to the originating office to handle as a management matter."  However, it is unknown if the criteria was implemented before the Plaintiff filed her allegations.  It is also unknown if OPR reported the Plaintiffs' allegations that involved serious misconduct, misuse of position, and prohibited personnel practices at EPIC to OIG.

71.     Also, the OPR investigation delayed the Plaintiff's EEO Investigation and the Plaintiff had to submit an Agreement to Extend the EEO Investigation on May 20, 2014.

72.     Unit Chief Travis Nattinger and Executive Assistant Edward Regula (two white males), were chosen to conduct the internal management review related to the administrative improprieties brought to light by the Plaintiff. It should be pointed out that there are female GS-14s (DEA) and GS-15s (non DEA) working at EPIC. This however, was another attempt to further harass and intimidate the Plaintiff for reporting the assault on her person by Mr. Olivares.

73.     During this internal review on March 18, 2014, the Plaintiff remembers being asked if she was aware that Mr. Olivares had a family to support. The Plaintiff responded that she is a single mother and also has a family to support. The Plaintiff remembers that Mr. Nattinger and Mr. Regula employed the technique of good guy and bad guy during their questioning and Mr. Nattinger frequently said he was playing "the devil's advocate." Mr. Nattinger and Mr. Regula indicated to the Plaintiff they did not want to discuss the issue of the assault because they did not want to be called by OPR to testify. It is evident that the management inquiry was nothing more than a mockery because it lacked the expertise and veracity necessary to conduct the review and key individuals were not interviewed. The agency failed to provide the Plaintiff a copy of the management internal review conducted by Mr. Nattinger and Mr. Regula.

74.     Plaintiff was not aware of her rights to remedies at the onset of this matter and only requested that Mr. Olivares be fired from his position. After become familiar with the process Plaintiff changed her remedy to include among other things her reassignment from EPIC to the El Paso Division Office to a position commensurate to the GS-12.

75.     The facts are that Mr. Olivares touched the Plaintiff inappropriately, unexpectedly, and without permission. Mr. Olivares' physical contact was both undesired and unwelcomed and in

breach of federal regulations for a hostile and violence free workplace environment. The Plaintiff never allowed any physical contact from Olivares and his intentional attack in front of her colleagues and subordinate employees was extremely offensive to the Plaintiff. Mr. Olivares' strike against her was yet another endeavor to humiliate and embarrass the Plaintiff in front of others intensifying the on-going hostile work environment created by Mr. Olivares towards the Plaintiff. The Plaintiff finds it unconscionable that Mr. Olivares, in his capacity of supervisor and leader, would engage in such an aggressive behavior and unprofessional conduct, with disregard for his actions, and in front of a room full of employees and especially in front of a witness, Program Analyst Graciela Vasquez.

76.     The Agency's wants the Commission to think that Mr. Olivares, as he stated to the OPR investigators that, "he was hurriedly going back and forth between his office and the Fiscal Office to resolve a "tense" budget crisis before the end of the fiscal year, and accidentally bumped into the Plaintiff when entering the Fiscal Office while he was looking at some papers in his hand." However, Mr. Olivares never mentioned to the EEO Counselor on December 11, 2013, that he (Olivares) was facing a "tense" budget crisis. Additionally, the individuals that were interviewed by the EEO Counselor did not substantiate Mr. Olivares' claim of a "tense" financial crisis. Vasquez, Sanchez, Padilla, Ortiz-Diaz, Southwick, Chavez-Barraza, and Acosta never mentioned that there was a financial crisis or anything along those lines.

77.     Mr. Olivares "elbowed" Plaintiff on the day that coincided with the date that DEA HQs was scheduled to sweep all of the funds for the fiscal year on September 23, 2013; thus, relieving the work of Olivares and Sanchez. To further clarify the memorandum titled "Year-End: FY2013 Things to Consider and Helpful Hints," dated September 4, 2013, from Christiania K. Sisk, indicates the FY2013 cut-off date as "September 23, 2013, the date that FR Sweeps all Available Funds."

78.     It would have been inconsiderate for Mr. Olivares to approve a leave request for Sanchez during the close-out, during what he claims "it was a very chaotic and hectic time." But, Mr. Olivares approved a leave request from the Supervisor Fiscal Specialist on Friday, September 20, 2013, the Friday prior to the assault.

79.     On December 13, 2013, Sanchez stated to the EEO Counselor, "It was Monday, the closing of the fiscal year, because I was out of the office on Friday." Mr. Olivares also approved leave for Accounting Technician Mary Ann Southwick on September 20, 2013, and approved leave for Purchasing Agent Elena Besaw on September 24, 2013. And, Mr. Holley and Besaw were out of the office on Friday, September 27, 2013. Mr. Olivares worked half a day on Friday, September 27, 2013. Also, the EEO Counselor interviewed Southwick, even though Southwick was on leave when the assault occurred on September 23, 2013, and Southwick's statements appear on the ROI. This would only suggest that the work at EPIC Fiscal was completed in a timely manner and before the cut-off date and Mr. Olivares came to work only to conduct the meeting with the Plaintiff and Acting Section Chief Garcia.

80.     There was no "chaotic and hectic time" as Mr. Olivares claims on September 23, 2013. Additionally, the supposed "budget crisis" finalized on August 19, 2013, when the Plaintiff received an email from Fitzgerald showing Fitzgerald's request for several budget realignments for six figure dollar amounts, because she projected a negative balance towards the end of the year. There was, indeed, no financial budgetary crisis occurring on September 23, 2013, as Olivares claims.

81.     Furthermore, it would have been unlikely for Mr. Olivares to conduct meetings if he was facing a financial crisis. Yet, on September 25, 2013, Mr. Olivares conducted a meeting with Fitzgerald and Sanchez to remove the Plaintiff's "Acting" duties and on September 27, 2013, and

Mr. Olivares conducted another meeting with the Plaintiff where he made accusations towards the Plaintiff in front of Acting Section Chief Rafael Garcia. There was, indeed, no financial budgetary crisis occurring on September 23, 2013, as Mr. Olivares claims when he assaulted the Plaintiff.

82.     The Agency again tries to minimize the assault which took place against the Plaintiff. Mr. Olivares "elbowed" the Plaintiff on the upper portion of her back. It would have been physically impossible for the Plaintiff to see Olivares "elbow" her when he came at her from behind. Mr. Olivares was not walking towards Plaintiff, otherwise, she would of seen him walking towards her. It would be false for the Plaintiff to state that she saw Olivares deliberately strike her. Additionally, Vasquez told the EEO Investigator "both of them acknowledged that he (Olivares) hit Plaintiff, and that she (the Plaintiff) felt it. Mr. Olivares inflicted pain to Plaintiff without provocation, and humiliated and intimidated her by his actions. Mr. Olivares further failed to apologize, if he did "elbow" Plaintiff on accident.

83.     The Agency's findings of how the assault occurred are wrong. The Plaintiff was standing inside the cubicle in the inner corner of the cubicle, and not "very close to the walkway if not actually in the walkway" as the Agency's states. Mr. Olivares went out of his way to step into the cubicle to intentionally "elbow" her. The door is located on the same wall where Plaintiff was standing directly in front of Vasquez and was facing Vasquez from approximately one arm's length away. The cubicle is shaped as an "L" and Plaintiff was in the middle of the "L." Additionally, the Plaintiff was "not directly" in the pathway. No one could have run into her where she was standing, which is why she was standing there so she could talk to Ms. Vasquez.

### *COUNT ONE*
### *TITLE VII VIOLATION - SEX (GENDER)*

84.     The Plaintiff realleges paragraphs 1 - 83 as if fully set forth herein.

85.     Defendant discriminated against Plaintiff herein since the agents and employees of Defendant engaged in discrimination based on sex in violation of Title VII of the Civil Rights Act. Specifically, the Plaintiff suffered adverse employment consequences as a direct result of sex (female). As a direct and proximate result of these actions, Plaintiff suffered sex discrimination.

86.     By reason of the Defendant's actions, the Plaintiff found it necessary to retain the services of an attorney in these proceedings and heretofore and is therefore entitled to attorney's fees pursuant to Title VII and under the general equity Powers of the Court.

### *COUNT TWO*
### *TITLE VII VIOLATION –NATIONAL ORIGIN (HISPANIC)*

87.     The Plaintiff re alleges paragraphs 1 - 86 as if fully set forth herein.

88.     Defendant discriminated against Plaintiff herein since the agents and employees of Defendant engaged in discrimination based on Race in violation of Title VII of the Civil Rights Act. Specifically, the Plaintiff suffered adverse employment consequences as a direct result of National Origin (Hispanic).  As a direct and proximate result of these actions, Plaintiff suffered National Origin (Hispanic) discrimination harassment.

89.     By reason of the Defendant's actions, the Plaintiff found it necessary to retain the services of an attorney in these proceedings and heretofore and is therefore entitled to attorneys' fees pursuant to Title VII and under the general equity Powers of the Court.

## *COUNT THREE*
### *HOSTILE WORK ENVIRONMENT*

90.     Plaintiff realleges paragraphs 1-89 as if fully set forth herein.

91.     The actions of Defendant, constituted a hostile work environment against Plaintiff, in the creation and condonation of a hostile work atmosphere which changed the terms and conditions of her employment.

92.     The unlawful employment practices in violation of the Civil Rights Act herein complained of, occurred in the course of Plaintiff's employment with Defendant, were carried on by Defendant's agents, servants, and employees and because the Agency threatened her with possible disciplinary action for filing EEOC Plaintiff and made the work environment one that a reasonable person could not endure without injury.

93.     Defendant discriminated and retaliated against Plaintiff herein as a female with respect to the terms, conditions, privileges, advantages and benefits of her employment with Defendant. Specifically, Plaintiff was harassed, held to stricter standards of performance, and denied benefits of employment accorded other employees.

94.     In addition, Plaintiff was treated dissimilarly from other employees.

95.     By reason of the Defendant's actions, the Plaintiff found it necessary to retain the services of an attorney in these proceedings heretofore and is therefore entitled to attorney's fees pursuant to the Title VII, and under the General Equity Powers of the Court.

WHEREFORE, Plaintiff respectfully requests:

   a.     A declaratory judgment, declaring Defendant's acts, through the acts of its agents, employees and successors, herein complained of to be in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991.

b.   Compensatory damages against the Defendant for each violation of Plaintiff's rights, as protected by Title VII and, for her pain, suffering, emotional distress, humiliation and for any resulting physical and emotional damages, in the amount of $300,000.00;

c.   Attorney's fees, court costs, prejudgment and post judgment interest as provided by law including Title VII; and

d.   Such other and further relief to which Plaintiff may be entitled.

                    Respectfully submitted,

                    ***The Law Office of Enrique Lopez***
                    701 N. St. Vrain Street
                    El Paso, Texas 79902
                    Telephone: (915) 351-0595
                    Facsimile: (915) 534-7207

By: _____
      ENRIQUE LOPEZ
      State Bar No.: 12563530
      **Attorney for Plaintiff**